UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                                    Plaintiff,

                                                        C.A. No. __-____

              v.

BLAST ENERGY SERVICES, INC. *f/k/a*
VERDISYS, INC., DANIEL W. WILLIAMS
AND ANDREW G. WILSON,

                         Defendants.


## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

## SUMMARY

1.      This matter involves violations of the anti-fraud provisions of the federal securities laws from mid 2003 through early 2004 by Blast Energy Services, Inc., *f/k/a* Verdisys, Inc. ("Verdisys"), an oil and gas field services company in Houston, Texas.  Verdisys, former Chief Executive Officer Daniel W. Williams and former Chief Financial Officer Andrew G. Wilson misled investors regarding the efficacy of Verdisys' lateral drilling technology, the status and success of its drilling operations, and its revenues.  (Verdisys, Williams and Wilson are collectively referred to herein as "Defendants.")

2.      Beginning in May 2003, Verdisys issued press releases that portrayed its technology it had licensed in 2003 (the "2003 Licensed Drilling Technology") as cost effective, proven, "leading technology."  The company also touted two drilling contracts under which it would supposedly earn revenues of $19 million by increasing production from a Louisiana gas field.  Verdisys omitted to

disclose, however, that the technology only consisted of two prototypes with no track record of substantial use, that Verdisys' two drilling customers had very limited financial resources with which to finance the projects from which Verdisys hoped to earn $19 million, and that no geologic or engineering studies revealed gas deposits within reach of the Verdisys technology.  As a result of those omissions, Verdisys affirmative representations were false and misleading.

3.     By mid-August 2003, Verdisys' 2003 Licensed Drilling Technology had proven unreliable and had failed to enhance production from the Louisiana field significantly.  Drilling operations were greatly slowed, if not altogether halted, by flooded and overgrown well sites, inadequate or non-existent pipelines, and the weak finances of its customers.  Verdisys did not disclose these facts, however, and, through the fall of 2003, in SEC filings and press releases, Verdisys repeatedly made false claims of drilling success and substantial revenues.

4.     Williams and Wilson were also aware of, but never caused Verdisys to disclose, the various contingencies and obstacles that called into question when, if ever, Verdisys would realize the $19 million in revenues that it touted.

5.     While the fraudulent conduct was occurring, Verdisys stock price climbed sharply on the Over-the-Counter Bulletin Board ("OTC BB").

6.     Verdisys has retained new executive officers, who have investigated various transactions and Verdisys financial reporting.  As a result, Verdisys has publicly acknowledged its inability to substantiate the delivery of any substantial amount of drilling services in the second and third quarters of 2003, and has restated financial disclosures in various SEC reports, to eliminate improperly recognized revenues.  Verdisys also has ceased using the 2003 Licensed Drilling Technology, having replaced it with a new process.

## JURISDICTION AND VENUE

7.     The Commission brings this action, pursuant to the authority conferred upon it by Sections 20(a) and 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 77t(a) and 78u(d)], seeking to permanently enjoin Defendants permanently from future violations of the federal securities laws.

8.     This Court has jurisdiction over this action, and venue is proper, pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

9.     Defendants, directly or indirectly, made use of the means or instruments of transportation and communication, and the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged herein. Certain of the transactions, acts, practices and courses of business alleged herein took place in the Southern District of Texas.

## DEFENDANTS

10.     **Verdisys**, a California corporation with headquarters in Houston, Texas, is primarily engaged in reworking existing oil and gas wells to renew or enhance production.  Verdisys also provides broadband satellite links for the remote monitoring and control of oil and gas wells and related infrastructure.  The common stock of Verdisys is quoted on the OTC BB.

11.     **Williams**, 47, of The Woodlands, Texas, was Verdisys president and CEO from March 2003 until his dismissal in December 2003.  He personally directed the company's drilling operations.

12.     **Wilson**, 50, of Alameda, California, was Verdisys CFO from March 2003 until January 2004.

## FACTS

### Background

13.    In late 2000, Verdisys was privately held, based in Fresno, California and known as TheAgZone, Inc.  It was attempting to establish an Internet-based exchange for the purchase and sale of agri-business goods and services.

14.    Beginning in late 2002, the company began providing satellite services to customers in rural markets, including energy companies seeking to send and receive data from oil and gas wells and pipelines.

15.    In the spring of 2003, Verdisys issued two million shares of stock, purportedly as consideration for software represented to monitor conditions within oil and gas wellbores.

16.    In the spring of 2003, Verdisys also acquired a license to use the 2003 Licensed Drilling Technology, which is a patented lateral drilling process.  As described by Verdisys in periodic reports filed with the SEC, the 2003 Licensed Drilling Technology pumped drilling fluids at high pressure through flexible hydraulic hoses and out a high-pressure nozzle, cutting new lateral channels from an original vertical well bore, to enhance the flow from previously tapped reservoirs of oil and gas or to reach new reservoirs.

17.    Verdisys then engaged in a reverse merger with a dormant, publicly traded shell company.  Defendant Verdisys is the entity that survived the reverse merger between the privately held Verdisys and Reconstruction Data Group, Inc., a California corporation that had recently ceased business operations, but which was still quoted on the OTC BB.  The merger did not become effective until July 18, 2003.  The stock of Reconstruction Data was exchanged for stock in Verdisys, the surviving entity.  (References herein to Verdisys and its common stock shall mean and

include the corporate predecessors of Verdisys and the stock of such entities, including Reconstruction Data Group, Inc.)

18.    Williams  became CEO and Wilson became CFO of the soon-to-be-public Verdisys. Williams had never served as an officer of a publicly held company.  Wilson performed his duties from his home, and from an office in California, where Verdisys kept its financial records, but the company's operations and headquarters were in Louisiana and Texas.  Wilson largely relied upon oral representations from Williams and others to learn the status of Verdisys business operations.

**Misrepresentations Regarding Drilling Technology**

19.    On May 2, 2003, Verdisys issued its first press release, which was prepared by Wilson and reviewed and approved by Williams.  The release announced Verdisys' acquisition of a license to lateral drilling technology, and claimed that the technology was "unique and cost effective," "had more than a decade of proven success in dramatically increasing the production of oil and gas wells," and was the "leading technology in the market for enhancing oil and gas well production from existing wells as well as extracting oil and gas from wells previously 'tapped out.'"

20.    The May 2, 2003 release misrepresented the status and efficacy of the technology.  As Williams was expressly aware, the license became available after the entity attempting to commercially deploy the technology dissolved in bankruptcy, and no established oil and gas companies bid for the technology.  When Verdisys acquired the technology, it was embodied in only two prototype rigs, consisting of compressors and hydraulic hoses attached to flatbed pickup trucks. The technology was not the subject of any final, mass-manufactured design, was not in wide-spread use, and was not in any great demand. While the technology's inventor and licensor documented some instances over the past decade in which the technology had enhanced well production, the

5

technology was hardly leading technology with a substantial track record of improving oil and gas production.  As the inventor\licensor expressly warned Williams, the 2003 Licensed Drilling Technology would not drill through particularly hard formations or perform properly on wells that deviated too far from the vertical or below 5,800 feet, and it only enhanced production in formations with adequate porosity, permeability and "drive" or pressure to force gas into the newly drilled lateral channels.  Enhanced production, warned the inventor\licensor, was essentially a well-by-well proposition.

**Misleading Announcements Regarding Contracts**

21.    On May 5, 2003 and June 16, 2003, Verdisys issued releases announcing a $5 million drilling services contract with an entity controlled by a Verdisys director and majority shareholder (the "Related Party") and on July 7, 2003, it issued a release announcing a $14 million contract with an unrelated, independent customer (the "Independent Customer").  Both contracts involved wells located in the Monroe, Louisiana gas field (the "Monroe Field").  Verdisys' 2003 Licensed Drilling Technology, according to the May 5, 2003 release, would "substantially reinvigorate the gas flow" from Monroe Field wells.  The Monroe Field, according to the July 7 release, was "the largest natural gas field in the world…in the 1970s," that had "largely been depleted of gas reserves available to traditional drilling methods."  Wilson prepared the releases, and Williams reviewed and approved them.

22.    The prediction that Verdisys' 2003 Licensed Drilling Technology would substantially reinvigorate the gas flow from the Monroe Field wells lacked a reasonable basis in fact and failed to disclose adverse facts calling into question its plausibility and validity.  Specifically, the prediction omitted that Verdisys' 2003 Licensed Drilling Technology was actually developmental and largely

unproven, and that neither Verdisys nor its customers were in receipt of any engineering or geologic studies analyzing the field and the wells and concluding that use of the Verdisys equipment would generate significant new gas production.

23.     The releases regarding the Related Party's contract did not disclose that the entity was a start-up venture, with no operating history in the oil and gas industry, and with no cash or revenues from ongoing operations, other than, potentially, the Monroe Field wells.  The release regarding the Independent Customer did not disclose that any payments beyond an initial $500,000 to drill the first eight wells were contingent upon the Independent Customer securing financing for additional use of the 2003 Licensed Drilling Technology and realizing gas production of at least $12,000 per month per well.  Otherwise, the Independent Customer would not proceed with additional drilling by Verdisys, and as a result, Verdisys might realize only $500,000 upon the touted $14 million contract.

**False Claims of Drilling Success**

24.     The June 16, 2003 release referenced above, and the release of July 7, 2003, added new chapters to Verdisys fictional account of its past successes and future prospects.  The Verdisys press release of June 16, 2003 claimed the company was pleased with the "rapid progress" of the drilling for the Related Party and that initial results from these first wells were "excellent." The release of July 7, 2003 claimed that Verdisys' lateral drilling technology was "unlocking ... reserves quickly, efficiently and economically" for the Independent Customer.

25.     In fact, however, Verdisys drilling operations were anything but rapid, excellent, efficient or economic.  The Monroe Field wells were not served by roads and were flooded and overgrown, which slowed and at times prevented access to well sites.  After Verdisys cut roads and moved its rigs on site to attempt operations, the rigs frequently experienced mechanical failure

(further demonstrating that the licensed technology was not proven, "cost effective," "leading" technology).  The wells never generated significant amounts of gas for either the Independent Customer or the Related Party, and many of the well heads were no longer connected to serviceable pipelines and other structures needed to gather and transmit natural gas.  The customers therefore never sold enough gas to generate the revenues needed to fund their contracts with Verdisys.

26.    Williams, because of his personal, on-site direct involvement in supervising Verdisys' drilling operations, knew the press release representations of June 16, 2003 and July 7, 2003 were false when made.  Wilson communicated with Williams regarding Verdisys' drilling operations.  At least by mid-August 2003, Williams and Wilson knew that representations that Verdisys was making "rapid" or "excellent" progress, and was re-initiating production from the Monroe Field, were false.  Williams and Wilson also knew that Verdisys had suspended re-working operations under the $5 million Related Party contract for non-payment.  (By that time, Verdisys had re-worked, at most, only two of the more than 100 wells that the contract covered.)

27.    Verdisys, Williams and Wilson never corrected the disclosures referenced in Paragraphs 24 and 25, which were inaccurate when made.  Disclosure regarding Verdisys' operational difficulties, and the financial weakness and financing dependency of its lateral drilling customers, would have called into question when, if ever, Verdisys would realize the projected revenues of $19 million from its two drilling services contracts. (Verdisys' lateral drilling services were its only significant, potential source of revenue, as its sale of satellite bandwidth generated only nominal revenues.)

**Misleading SEC Reports**

28.   The current event and periodic reports that Verdisys filed with the SEC repeated the misleading disclosures in the press releases.  Williams and Wilson oversaw the preparation of these reports, and signed and certified them.  They also communicated with Verdisys' auditor regarding accounting issues.

***Failure to Disclose Operational Difficulties***

29.   Verdisys' first inaccurate SEC report was the Form 10-QSB filed August 20, 2003, for the quarter ended June 30, 2003.  The Management's Discussion and Analysis ("MD&A") disclosures stated, without qualification, that in the future Verdisys would earn at least $19 million from its drilling contracts, the report did not disclose the operational difficulties Verdisys had encountered during drilling operations.  Also, while the report claimed Verdisys' drilling rigs could reach as much as 300 feet from the existing original vertical well bore, Williams knew that the rigs were only reaching approximately 30 feet from the well bore.  The report did not disclose this limitation, which dramatically lessened the likelihood that a well re-worked by Verdisys would realize enhanced or new production.

***False Revenue Claims***

30.   Verdisys' reporting failures continued with the Form 8-K that Verdisys filed with the SEC on September 24, 2003, to announce the completion of the reverse merger.  The financial statements included with the report overstated Verdisys' revenues by almost 24% for the three months ended June 30, 2003, and by more than 18% for the six months ended June 30, 2003.

31.   Unknown to Wilson or Verdisys' auditor, Williams had begun fabricating reports regarding the number of wells that Verdisys had re-worked.  Verdisys re-worked at most two wells

during the quarter ended June 30, 2003, but Williams told Wilson and his accounting staff that Verdisys had re-worked four wells.  As a result, Verdisys recorded and disclosed revenues that were overstated by $115,000.

### *Sham Software Acquisition*

32.    Additionally, the Form 8-K misrepresented the circumstances of Verdisys' issuance of two million shares of restricted stock.  A footnote to the financial statements advised that in April 2003, Verdisys issued two million shares of common stock for the software, valued at $1 million, to acquire software, but that the software was useless and Verdisys was therefore recording an impairment expense of $1 million.

33.    The director and majority shareholder that controlled the Related Party to the drilling services contract had instigated the transaction, and secured its approval by Verdisys' board.  The transaction called for Verdisys to issue two million shares to acquire software that ostensibly allowed the remote monitoring of oil and gas wells (a new business line that would compliment Verdisys' sales of broadband satellite links to oil and gas companies).  The software, however, could only screen job applications and resumes of health care executives.

34.    In reality, the acquisition of software was a sham to conceal that Verdisys was issuing shares to retain a stock promoter.  Wilson was instructed to deliver the one million shares to the shareholders of the software company, based on the percentage of their ownership interest in the software company.  The promoter (represented to be a shareholder of the software company) received one million restricted shares valued at $500,000, the director and majority shareholder in Verdisys arranging the transaction received 230,000 shares, and the shareholders of the California software company received the remaining 770,000 shares.

10

35.    Wilson did not know at the time of its purchase that the software was useless, or that, at the time of their delivery, half the shares constituted compensation for the services of a stock promoter.  The software was not delivered for nearly nine months, however, and proved useless, and the promoter who had received shares began performing investor relations services for Verdisys. Wilson failed to exercise sufficient professional diligence or skepticism in inquiring into these circumstances.

## Williams' False Reports of Wells Drilled

36.    During the fall of 2003, Williams continued to report falsely the number of wells re-worked by Verdisys.  On October 3, 2003 and November 7, 2003, Williams had Wilson and Verdisys issue press releases claiming that the Independent Customer was "very pleased with the results from the initial 25 wells that have been drilled using Verdisys' lateral drilling technology," and that Verdisys had demonstrated the ability to drill more than ten wells per month.  The releases also noted that Verdisys would share in the production revenues, after the customer had recovered its costs.

37.    Verdisys had re-worked no wells for the Independent Customer at the time of the releases of October 3 and November 7, 2003.  Also, Verdisys had never re-worked the 25 wells that it claimed in the October, 3, 2003 release or the 29 wells that Williams claimed in testimony. Instead, Verdisys had laterally drilled at most two wells, during the quarter ended June 30, 2003 (both for the Related Party), none for any customer during the quarter ended September 30, 2003, and only seven during the quarter ended December 31, 2003.

**Misleading Third Quarter Report**

38.    Verdisys' various reporting and disclosure transgressions culminated in the preparation and filing of the company's Form 10-QSB for the quarter ended September 30, 2003 (the "3Q Form 10-QSB").  During November and December 2003, Verdisys and its officers effected a haphazard series of disclosures, false filings and amendments that, among other things, led to the issuance of a Section 10A letter by the company's auditors.

*Original 3Q Form 10-QSB Report*

39.    In mid-November 2003, in connection with preparation of the 3Q Form 10-QSB, Verdisys' auditor questioned a $1.5 million receivable purportedly owed by the Independent Customer, because contract contingencies related to financing and profitability were not met, and because collection was not reasonably assured.  The filing of Verdisys' 3Q Form 10-QSB was delayed, while Williams and others attempted to confirm collectibility and eliminate the contract contingencies.

40.    On November 17, 2003, Williams caused Verdisys to issue a press release predicting that on November 19, 2003, after the close of the market, Verdisys would announce record third quarter 2003 revenues and earnings.  The release quoted Williams as claiming that the financial results would demonstrate the company's ability to achieved profitability in the first 90 days of lateral drilling operations.

41.    The prediction of record earnings depended upon the Independent Customer having incurred drilling expenses of some $2 million, $500,000 of which it had paid with loan proceeds and $1.5 million of which it owed upon an accounts receivable.  As set forth above, Williams had falsified the reports of drilling work, so the Independent Customer should not have paid the initial

12

$500,000 and did not owe another $1.5 million for additional drilling work done.  The Independent Customer was unaware of Williams' falsification; it was based in California, had no personnel on-site in Louisiana, and had no system for observing or checking what drilling services, if any, Verdisys performed.  As a result, the Independent Customer, trusting the word of Verdisys and Williams, believed it owed Verdisys the $1.5 million (in addition to the $500,000 paid), and gave written confirmation that it owed $1.5 million and that it agreed to waive retroactively the financing and profitability contingencies in the drilling contracts.

42.    The Independent Customer was misled regarding the circumstances in which it gave the confirmation and waivers.  They were sought in connection with negotiations for Verdisys to buy out the Independent Customer's interest in the Monroe Field drilling project and to assume all of the Independent Customer's liabilities related to the Monroe Field.  The Independent Customer therefore only executed the confirmation to establish the amount of the liabilities that Verdisys would assume under the buy-out agreement, which nullified any receivable from the Independent Customer, extinguished Verdisys' right to earn another $12 million under the touted $14 million contract with the Independent Customer, and caused Verdisys to assume substantial debts and liabilities.

43.    Williams passed the confirmation and waivers on to Wilson and the company's accounting staff (which then supplied them to the auditor) without disclosing the context under which they were procured and without disclosing the related buy-out agreement.

44.    On November 19, 2003, Williams and Wilson allowed Verdisys' accounting  staff to file the 3Q Form 10-QSB with reviewing the report before it was filed, and without the company's auditor having reviewed the financial statements accompanying the report.

13

45.     The report filed by Verdisys falsely claimed that the company had earned total current period revenues of $2.09 million, including the $500,000 that the Independent Customer had paid with borrowed funds and the $1.5 million that the Independent Customer supposedly owed to Verdisys and which was the subject of the confirmation and the contract contingency waivers.

### Section 10A Letter

*46.*     On November 20, 2003, the day after the filing, Verdisys auditor submitted a letter under Section 10A of the Exchange Act to the SEC and the NASD, complaining that Verdisys had filed its 3Q Form 10-QSB without his review or approval.  The letter further explained that Verdisys recognized revenues related to the Independent Customer, rather than deferring the revenues, over "strenuous objections and without [the auditor's] knowledge."  That same day, Verdisys made its first amendment of the 3Q Form 10-QSB, revealing that its auditor had not reviewed the financial statements therein.

### Second Amended 3Q Form 10-QSB

47.     Verdisys' auditor made additional inquiries to Wilson and Williams regarding the $1.5 million receivable, and reviewed the confirmation and waivers that Williams had procured.  Williams also gave the auditor a representation letter claiming that he (Williams) was unaware of any fraud and had made available all financial records.

48.     On December 3, 2003, following the auditor's review, Verdisys filed its second amended report.  Verdisys still claimed approximately $2 million in revenues, but, at the instigation of the auditor, classified only the $500,000 already paid by the Independent Customer as current period revenues.  The remaining $1.5 million (supposedly owed by the Independent Customer) was re-classified as deferred revenues, since the Independent Customer's written confirmation had

seemingly confirmed the amount at issue, but not its collectibility, and because the auditor declined to agree that the contingencies waivers were retroactively effective.

### *Particular Third Quarter Misrepresentations*

49.     Regardless of whether Verdisys classified the quarterly revenues as current or deferred, however, it overstated them by $2 million, or nearly 100%. Verdisys had not done the drilling work supposedly underlying the claimed revenues: Williams' false drilling reports were the only basis for the reported revenues.  The 3Q Form 10-QSB report also omitted disclosure that Verdisys had incurred substantial contingent liabilities in connection with the buy-out agreement, that Verdisys had guaranteed the Independent Customer's lease obligations, that Verdisys' drilling projects faced severe operational difficulties, that Verdisys spent about $700,000 of its disclosed $1.17 million cost of services to cure infrastructure deficiencies, and that Verdisys had issued stock valued at $500,000 to retain a stock promoter.  Finally, the second amended 3Q Form 10-QSB falsely claimed a $337,500 account receivable from the Related Party.  Verdisys had drilled at most two wells for the Related Party during the second quarter of 2003, and no wells during the third quarter for the Related Party.  The receivable should therefore have totaled no more than $130,000.

### Market Activity

50.     Verdisys' various misleading disclosures, from early May 2003 through late 2003, appear to have caused a slow but steady increase in the company's stock price.  Trading on the OTC BB began on June 2, 2003, when Verdisys common stock closed at $1.15.  By that time, Verdisys had issued the misleading press releases claiming to have acquired unique, cost effective leading technology, and to have entered into the $5 million contract with the Related Party.

51.    On June 16, 2003, when Verdisys issued the release falsely claiming rapid progress and excellent initial results on the Related Party contract, the stock was trading for about $2.  The price had risen to about $3 at the time of the July 7 release announcing that Verdisys was quickly unlocking reserves and had secured a $14 million contract with the Independent Customer.

52.    The July 7 release did not generate an immediate spike in price and volume, but by September 24, 2003, the day Verdisys filed the Form 8-K presenting financial statements for the reverse-merged entity, the stock had risen to close at $14.40.  For the next month and a half, the stock traded between a high of $15.25 to a low of $9.80, to close at $13.35 on November 17, the day Verdisys filed a press release announcing it would report record earnings in its pending Form 10-QSB.  The next day, the stock closed at $14.25, on a relatively high volume of 247,581 shares.  The price closed the same the following day, on a sharply lower volume of 57,635 shares, after Verdisys filed its badly deficient and amateurish initial 3Q Form 10-QSB.

53.    By December 4, 2003, when Verdisys amended the initial quarterly report and reported sharply lower earnings, the stock had declined to close at $8.90, on a volume of 239,647 shares.  Thereafter the stock continued to fall in price, to trade in the $5 to $6 range by March, when the Commission suspended trading in the securities of Verdisys for a ten-day period.

**Acknowledgement of Misrepresentations and Omissions**

54.    In December 2003, Verdisys board dismissed Williams and demoted Wilson over the bungled 3Q Form 10-QSB, and retained new executive officers.

55.    After further inquiry into various events, on April 15, 2004, in the company's 2003 annual report filed with the SEC on Form 10-KSB, Verdisys acknowledged its inability to

16

substantiate the delivery of drilling services in the second and third quarters of 2003 and announced

that "consequently, no revenue has been recognized for the performance of these services."

56.     In May 2004, Verdisys restated its prior quarterly and current reports, including its 3Q

Form 10-QSB, to eliminate all unearned and improperly recognized revenues.   Verdisys also

disclosed the true purpose of the issuance of the two million shares, as well as the buy-out agreement

and lease guarantee involving the Independent Customer.

**FIRST CLAIM**
**Violations of Section 10(b)**
**of the Exchange Act and Rule 10b-5 Thereunder**

57.     Paragraphs 1 through 56 are realleged and incorporated herein by reference as if set

forth in full.

58.     Based on the conduct alleged herein, Defendants Verdisys and Williams, in connection

with the purchase or sale of securities, have:

    a.     employed devices, schemes, or artifices to defraud;

    b.     made untrue statements of a material fact or omitted to state material facts

        necessary in order to make the statements made, in the light of the

        circumstancesunder which they were made, not misleading; or

    c.     engaged in acts, practices, or courses of business which operate or would

        operate as a fraud or deceit upon any person.

59.     Defendants Verdisys and Williams made these misrepresentations and omissions

knowingly or with severely reckless disregard for the truth.

60.    By reason of the foregoing, Defendants Verdisys and Williams, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

**SECOND CLAIM**
**Aiding and Abetting Violations of Section 10(b)**
**of the Exchange Act and Rule 10b-5 Thereunder**

61.    Plaintiff Commission repeats and incorporates paragraphs 1 through 56 of this Complaint by reference as if set forth verbatim.

62.    As described above, Defendant Verdisys, directly and indirectly, in connection with the purchase and sale of securities, and by use of the means and instrumentalities of interstate commerce and of the mails, made material misstatements, and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

63.    By reason of his foregoing acts and practices, Defendant Wilson knowingly or recklessly aided and abetted the violations described above by Defendant Verdisys of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

18

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court:

### **I.**

Find that the defendants committed the alleged violations.

### **II.**

Permanently restrain and enjoin Defendants from, directly or indirectly, violating, or aiding and abetting the violation of, the provisions of law and rules alleged in this Complaint.

### **III.**

Order Defendants to pay civil penalties, including post-judgment interest, pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court.

### **IV.**

Prohibit Defendants Williams and Wilson from acting as an officer or director of any issuer required to file reports pursuant to Sections 12(b), 12(g) or 15(d) of the Exchange Act [15 U.S.C. §§ 78l(b), 78l(g) and 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**V.**

Grant such other relief as this Court may deem just or appropriate.

Respectfully submitted,

/s *Jeffrey B. Norris*
JEFFREY B. NORRIS
District of Columbia Bar No. 424258
S.D. Texas Bar No. 23166
Attorney-in-Charge

SECURITIES & EXCHANGE COMMISSION
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
(817) 978-3821/-6452
FAX:  (817) 978-4927

Of Counsel:
ROBERT C. HANNAN
Texas Bar No. 08924700
JOHN C. MARTIN
District of Columbia Bar No. 443435

SECURITIES AND EXCHANGE COMMISSION
Fort Worth District Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882